UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

_____

DANIEL WEST, M.D.,                                    Case No. 1:24-CV-_____

    Plaintiff,                                                          Hon. _____

v.

TRINITY HEALTH MUSKEGON HOSPITAL,
TRINITY HEALTH MEDICAL GROUP,
MERCY HEALTH PHYSICIANS GROUP,

    Defendants.
_____

### COMPLAINT AND
### DEMAND FOR JURY TRIAL
_____

## COMPLAINT

### INTRODUCTION

    1.    This action arises under the False Claims Act ("FCA"), 31 U.S.C. § 3729 et seq.; and a factually-related state law claims for violation of Michigan's Whistleblowers' Protection Act ("WPA"), Mich. Comp. Laws § 15.361 et seq.

    2.    This Court has jurisdiction under 28 U.S.C. §§ 1331 and 1367.

    3.    Venue is proper in the Western District of Michigan. The acts which are the subject of this action occurred in the Western District of Michigan.

### THE PARTIES

    4.    Plaintiff Dr. Daniel West, M.D., is a board-certified cardiologist and

resident of Muskegon County, Michigan, located in the Western District of Michigan. Dr. West has worked in the Muskegon community as a cardiologist for Defendant Mercy Health Physicians Group d/b/a Trinity Health Medical Group ("THMG") and its various predecessor entities for 35 years. On October 28, 2024, THMG fired Dr. West without cause and without warning. In fact, representatives of THMG refused to provide any explanation for firing Dr. West, except to confirm that it was without cause.

5. Plaintiff had privileges at Defendant Trinity Health Muskegon Hospital ("THMH") and its various predecessor entities until THMG fired him without cause on October 28, 2024.

6. Defendant Trinity Health Muskegon Hospital (THMH) is a hospital in Muskegon County and is part of the multi-state Trinity Health system. THMH delivers healthcare to individual patients throughout Michigan and other states at a number of facilities and in multiple practice specialties.

7. Plaintiff and Defendant THMG entered into their most recent employment agreement on or about June 1, 2022.

## INTRODUCTION

8. After Plaintiff concluded his cardiology fellowship in 1989, he joined a cardiology practice group, West Shore Cardiology, with privileges at what was then known as Hackley Hospital in Muskegon, Mercy Hospital in Muskegon, Muskegon General Hospital, and North Ottawa Community Hospital, now collectively known

as Trinity Health. He has practiced continuously in the Muskegon community at the same hospitals, despite multiple name changes and mergers since that time.

9. During his 35-year career in Muskegon, Dr. West has had a strong work ethic, wonderful patient relationships, and a collegial relationship with his colleagues (both physicians and other staff). During his tenure in Muskegon, Dr. West was deeply involved in the sale of West Shore Cardiology to Mercy Hospital, the relocation of the office, and worked closely with four different practice office managers.

10. Dr. West served as Lead Cardiologist of the practice at THMG until June 17, 2024, as well as Chief of Cardiology for Trinity Health Muskegon Hospital until that same date. On that date, Defendants summarily suspended Dr. West from his office practice and from his hospital privileges, without due process and in violation of multiple policies. Defendants suspended Dr. West because he reported to the Trinity Health administration that one of his colleagues, Dr. David Dirk Bonnema, had been performing unnecessary patient surgeries. Dr. West lodged this allegation after an extensive study of those procedures by the other doctors in the practice.

11. Defendants refused to detail to Dr. West the substance of the allegations leading to Defendants' summary suspension of Plaintiff, which they said only was because of an alleged "behavior" issue that they would not further specify. Defendants did not provide any opportunity to respond or answer questions for several weeks. In the meantime, THMG canceled and rescheduled patient visits and

procedures with Dr. West – which are scheduled for weeks or months in advance – in an area which is already short of cardiologist services.

12. On or about July 11, 2024, Dr. West and all of the other cardiologists in the Trinity Health cardiology practice in Muskegon submitted a signed letter outlining their concerns about Dr. Bonnema's procedures to multiple members of Defendants' respective administrative teams.

13. On July 18, 2024, Dr. West reported the concerns of the cardiologists regarding Dr. Bonnema's procedures to the U.S. Attorney's office in Grand Rapids, specifically the assistant U.S. Attorney assigned to review cases of alleged fraudulent claims to the Medicare and Medicaid programs.

14. On August 2, 2024, Plaintiff's attorney advised Defendants that the U.S. Attorney's Office requested that Dr. West provide his documents to the U.S. Attorney's Office related to his claim about Dr. Bonnema providing unnecessary surgeries.

15. Earlier the same day, August 2, 2024, THMG notified Dr. West that it would return him to work on a "Final Written Warning" status. (Ex. B.) Trinity Health Muskegon Hospital restored Dr. West's privileges, but THMH and THMG later made permanent his removal as Chief of Cardiology and lead partner of the cardiology practice. Defendants refused to return him to those positions, informing him that he could no longer serve in those roles because THMG had placed him on "Final Written Warning" status.

16. Dr. West returned to treating patients for three months until Dr. Mohammed Salameh, CMO of THMG Michigan; Dr. Lisa Kinsey-Calloway, CMO of THMG West Michigan; and Michael Hardiman, of the Trinity Health Human Resources Department, met with Dr. West on October 28, 2024, and advised Dr. West that THMG was firing him without cause. They refused to provide any further information. Dr. Salameh stated clearly that Dr. West's restrictive covenant, i.e., his non-compete agreement with THMG, would be considered null and void as the termination was without cause.

17. The true reason for Trinity Health's decision to fire Dr. West was in retaliation for his report that Dr. Bonnema was performing unnecessary surgeries – a report that was supported by the other physicians in the cardiology practice.

## BACKGROUND

18. In June 2021, the lead echocardiography technician for the cardiology practice, Alisha Stitt, approached Dr. West and Dr. John Meek to express concerns that Ms. Stitt had regarding Dr. Bonnema's interpretation of echocardiographic studies on patients who were being considered for the implantation of cardioverter defibrillators.

19. Implantable cardioverter defibrillators (ICDs) are cardiac devices similar to, but more powerful than, a pacemaker. Whereas a pacemaker's role is to prevent inappropriately slow heart beats, an ICD is a fully functional pacemaker that can also shock a patient internally, in the same way a first responder might shock a patient externally, when a life-threatening arrhythmia is detected. ICDs

have two primary indications: a patient who has survived a potentially lethal abnormal heart rhythm, or a patient with a sufficiently weakened heart that they are at increased risk for sudden cardiac death. The concerns of Dr. West and his other cardiology physician colleagues involved patients of Dr. Bonnema in the latter category.

20.     Ms. Stitt brought an echocardiogram of a patient of Dr. Bonnema's to Dr. West and others and raised concerns that Dr. Bonnema was misreading the results, frequently documenting reports of ejection fractions (EFs) of .35 or less, when it was felt to be clear that the heart was much stronger. Results of EFs of .35 of less would indicate that an ICD was appropriate and necessary for a patient. This particular study that Ms. Stitts provided to Dr. West and his colleagues – of a patient for whom Dr. Bonnema had scheduled surgical placement of an ICD – was then reviewed by three cardiologists, who all felt the EF to be closer to .45. Interestingly, Dr. Bonnema had deleted the technician's objective assessment, called Simpson Bi-plane, from the report.

21.     When confronted by Dr. West, Dr. Bonnema claimed that his interpretation was accurate and proceeded with the ICD surgery.

22.     After then looking at some of Dr. Bonnema's other EF measurements on a few other patients, Dr. West and some of his colleagues felt Dr. Bonnema was engaging in a pattern of consistent underestimation of the ejection fraction (EF) measurement, with frequent reports of EFs of .35 or less, which would otherwise support a conclusion that surgical implantation of an ICD was indicated.

Intentional underestimation of the EF leads to the unnecessary, expensive and risky implantation of ICDs in patients who do not require them, with a subsequent need to replace the devices every 8-10 years when the batteries would become depleted.

23. Further investigation disclosed that nuclear medicine technicians had also witnessed Dr. Bonnema requesting manipulations of data on nuclear studies to achieve EFs of .35 or less.

24. In the meantime, THMH elevated Dr. Bonnema to its Chair of its Peer Excellence Committee, which conducts peer review of other physicians' clinical decisions. Shortly after this appointment, Dr. West expressed his concerns about Dr. Bonnema's potentially fraudulent activity to Dr. Justin Grill, the Chief Medical Officer for Trinity Health in Muskegon. Upon learning of these concerns, Dr. Grill chose to defer further investigation to Dr. West and told Dr. West to bring any proof of the allegations to his attention, so that it could be reviewed by Dr. Bonnema's PEC Committee.

25. Dr. West and his fellow cardiologists then spent nearly two years attempting to investigate Dr. Bonnema's ICD procedures without official THMG or THMH assistance.

26. In the meantime, in 2021, THMG administration hired Mary Hewitt to become the new practice manager for the cardiology office in Muskegon. Within six months to a year, Ms. Hewitt had clashed with almost all of the Muskegon cardiologists, and many of them felt that she did not possess the skills and

temperament needed to be successful. At one point, she refused to continue attending practice group meetings – even though they were an integral part of her responsibilities as the office manager. She made it clear to others that the primary reason was her inability to tolerate any difference of opinion from the providers, even when presented in a civil, respectful and constructive manner.

27. On October 19, 2023, Dr. West, as the lead physician for THMG-Cardiology in Muskegon, took the physicians' concerns about Ms. Hewitt's performance to her supervisor, Patrick Ahearn, the Regional Director of Cardiovascular Services. Despite learning of the situation, Mr. Ahearn appeared to have ignored the providers' pleas for help and instead sided with Ms. Hewitt.

28. On May 13, 2024, during a weekly practice group meeting with Mr. Ahearn present with all of the other Muskegon cardiologists, Dr. Bonnema openly admitted his intention to falsify medical records by intentionally underestimating the ejection fraction on an echocardiogram to allow placement of a cardiac device. While Mr. Ahearn did not appear to comprehend the significance of Dr. Bonnema's admission, the other physicians present for this admission were shocked.

29. On May 15, 2024, Dr. West finally received a list from a medical device provider, which he had been attempting to obtain for some time, that detailed devices, including ICDs, that they supplied to the Muskegon cardiology practice, with notation on the implanting cardiologist. This allowed Dr. West and other colleagues to complete a comprehensive review of Dr. Bonnema's patient files where ICDs had been surgically implanted.

30. With at least three doctors from the practice reviewing each patient file from Dr. Bonnema's surgeries, a troubling pattern emerged of fraudulent implantation of ICDs on patients whose imaging did not support a recommendation to do so, exposing those patients to risky surgery and permanent placement of a sizeable device inside their chests. Dr. West collected all of the information gathered from the reviewing doctors into a single report to give THMH executives.

31. Three weeks after revealing that report to his superiors, on June 17, 2024, Defendants suspended Dr. West from both his employment and his hospital privileges with only a vague explanation of a concern related to his "behavior" in the office that warranted immediate suspension. It was made very clear that this suspension had nothing to do with the hospital or patient care. Michael Hardiman, of the Human Resources Department, informed Dr. West that his immediate suspension and investigation would be completed by June 28, 2024.

32. Dr. Bonnema has close relationships with Dr. Jerry Evans, currently the chief of staff for THMH; Dr. Justin Grill, CMO of THMH; Dr. Theodore Boeve, interim Chief of Cardiology; and Gary Allore, President of THMH.

33. On June 26, 2024, Mr. Hardiman instead informed Plaintiff that his suspension from employment and hospital privileges would continue indefinitely, as he reported, because the investigation allegedly proved to be more complicated than had been originally anticipated. At that point, no one from THMG or THMH had yet interviewed Plaintiff or told him any more about the alleged "behavior" concern. Plaintiff later learned that some of the office staff, who all worked under the

supervision of Ms. Hewitt, had informed patients that Plaintiff was "retiring" or "retired," or insinuated that he was not likely to come back to work when they called to reschedule his canceled patient office visits and procedures. Some patients had interpreted the staff's comments as suggesting Dr. West was stricken by a medical or mental health crisis.

34. Plaintiff feared that THMG might just fire him and bury what Plaintiff reported about Dr. Bonnema's procedures, so he and the rest of the cardiologists authored a letter to Jason Harris, COO of Trinity Health Michigan Medical Group; Dr. Lisa Kinsey-Calloway, CMO of THMG; and Dr. Grill, CMO of THMH. Plaintiff also lodged his concerns with the U.S. Attorney's Office.

35. On July 24, 2024, Monica Lareau, Vice President of Privacy and Organizational Integrity for the Trinity system, contacted Plaintiff and all of the other physicians who signed the letter to report their opinion that Dr. Bonnema had implanted unnecessary ICDs. Ms. Lareau accused the physicians of being in violation of HIPAA privacy laws by their email transmission of the evidence against Dr. Bonnema – that Dr. Grill had instructed Plaintiff to bring to him if he had it. Ms. Lareau demanded that all of the physicians on the letter destroy all of their copies of the accompanying data to support the letter. Nothing was said to Plaintiff or the other cardiologists about Defendants doing anything to investigate the substance of the serious allegations in their letter.

36. On August 2, 2024, Plaintiff's attorney contacted Tiffany Buckley-Norwood, the associate general counsel for THMH, and asked to discuss the

command that Dr. West destroy this evidence, noting that the U.S. Attorney's Office had sent a request for the information to Plaintiff. Plaintiff's counsel also noted that she had requested that Defendants implement a litigation hold, for which this information would qualify, and which also counseled against destruction.

37. In addition, the assistant U.S. Attorney investigating the matter supported Plaintiff's counsel's view that Plaintiff and his colleagues had not violated HIPAA by transmitting patient data for the purpose of making a report like the one they did.

38. Nonetheless, after providing the information to the U.S. Attorney's Office pursuant to its official request and confirming that THMH's counsel preserved the material, Plaintiff complied with Defendants' again-repeated command to destroy his copies.

39. THMG returned Plaintiff to work on August 5, 2024, and similarly restored his hospital privileges on that date. THMG returned him under a "Last Chance"-style agreement, saying that they allegedly found that his behavior with staff was a problem. They noted instances where they said Plaintiff opposed new administrative practices and would not submit to those requirements despite being told. However, they refused Plaintiff access to their report of investigation and refused further specifics in writing. They told him only that if he violated any "further" policies of the Muskegon Hospital or THMG, Defendants would terminate him.

40. Despite feeling that this was a set-up for a retaliatory firing, Plaintiff

returned to work to serve his patients. He worked until October 28, 2024, when Defendants fired him without cause.

### Count I – Violation of False Claims Act - Retaliation

41. Plaintiff incorporates the allegations of prior paragraphs, as if they were restated herein.

42. Dr. West engaged in protected activity, as defined by 31 U.S.C. § 3730(h)(1), by undertaking steps to stop Defendants from submitting claims for reimbursement to Medicare and/or Medicaid, which were based upon fraudulently created medical records.

43. Dr. West alerted Dr. Grill in June 2021 to a problem with Dr. Bonnema's ICD procedures and in May 2024 by turning over his aforementioned report.

44. Within three weeks of submitting a report and notes of Dr. West and other doctors from the practice group detailing their accusation about Dr. Bonnema's fraudulent procedures, Defendants took a variety of adverse actions in retaliation against Dr. West, including suspending him from employment and hospital privileges; later permanently terminating his practice lead position and his Chief of Cardiology position with the hospital; falsely reporting and/or insinuating his retirement to patients; and eventually firing him and ending his hospital privileges entirely.

WHEREFORE, Plaintiff requests that the Court award Plaintiff economic and compensatory non-economic damages in an amount that would fully compensate him for the injuries alleged herein, his costs and reasonable attorney fees, and such other relief as may be just and equitable.

### Count II – Violation of Michigan's Whistleblowers' Protection Act

45. Plaintiff incorporates the allegations of prior paragraphs, as if they were restated herein.

46. Dr. West engaged in protected activity, as defined by Mich. Comp. Laws § 15.361 et seq., by reporting his belief to the U.S. Attorney's Office that Defendants and Dr. Bonnema were submitting claims for reimbursement which were based upon fraudulently created and/or altered medical records, which violates federal and state law.

47. Defendants took a variety of adverse actions, including suspension of employment and hospital privileges, loss of practice and hospital department management positions, and eventual termination of employment and hospital privileges, in retaliation for Plaintiff's protected activity under WPA.

48. As a result of the foregoing, Plaintiff has lost earnings and benefits and incurred mental anguish, emotional distress, unfair reputational damage, and legal costs and attorney fees for which Defendants are liable.

WHEREFORE, Plaintiff requests that the Court award Plaintiff economic and compensatory non-economic damages in an amount that would fully compensate him for the injuries alleged herein, costs and reasonable attorney fees, and such other relief as may be just and equitable.

                                              PINSKY SMITH, PC
                                              Attorneys for Plaintiff

Dated: November 19, 2024                By: /s/ Sarah R. Howard
                                              Sarah Riley Howard
                                              Shoran Reid Williams
                                              146 Monroe Center St NW, Suite 418
                                              Grand Rapids, MI  49503
                                              (616) 451-8496
                                              showard@pinskysmith.com
                                              swilliams@pinskysmith.com

## JURY DEMAND

To the extent that jury trial is available as to any of the issues set forth above, Plaintiff hereby demands same.

PINSKY SMITH, PC
Attorneys for Plaintiff

Dated: November 19, 2024				By:   /s/ Sarah R. Howard
Sarah Riley Howard
Shoran Reid Williams
146 Monroe Center St NW, Suite 418
Grand Rapids, MI  49503
(616) 451-8496
showard@pinskysmith.com
swilliams@pinskysmith.com